### 9942

KIRKLAND *ET AL.* v. MOSELEY *ET AL.*

(96 S. E. 608.)

1. COMPROMISE AND SETTLEMENT—MISTAKE.—Where the clauses of a will were open to two constructions, devisees who on the advice of a

lawyer compromised with others could not have the compromise agreement set aside on the ground of mistake on discovering later that they thereby lost part of the estate to which they were entitled, since they accomplished what they intended to do by the instrument, in that they avoided litigation and secured a part of the estate.

2. COMPROMISE AND SETTLEMENT—MISTAKE.—Where an attorney, the husband of a devisee, representing her, acted upon an erroneous opinion of the law in signing a compromise agreement, his wife cannot have the agreement set aside on the ground of mistake.

3. WILLS—DEVISE TO INDIVIDUAL OR CLASS.—Will devising land to five persons "—children of my friends * * * the said land to be divided among the said five children share and share alike, and in fee," expressly excluding a sixth child, was to individuals and not to the class; the words "children of my friends" being mere *descriptio personæ,* and the dash being used in the sense of a parenthesis by way of comment inserted in a sentence which would be grammatically complete without it.

4. WILLS—CONSTRUCTION—PRESUMPTION—RESIDUARY CLAUSE.—It is presumed that testatrix intended to make a complete disposition of her estate, and a will disposing of any residuum included any lapsed devise.

5. WILLS—CONSTRUCTION—COMPARISON WITH EARLIER WILL.—The mere fact that testatrix had made a prior will containing a different disposition was not sufficient to overcome the plain words of a devise to other persons.

6. WILLS—CONSTRUCTION—RESIDUARY CLAUSES.—A devise of "all the rest and residue of my property of every kind and description whatsoever and wheresoever situated," is a general devise of the residuum.

7. WILLS—CONSTRUCTION—RESIDUARY CLAUSES.—When such devise was followed by a codicil devising "all the rest and residue of my property of every kind and description whatsoever and wheresoever situated" to two persons "after the payment of $500 to my friend C., my purpose being to give all of my personal property of every kind" to the persons named in the will, except the sum of $500, was a general devise of the residuum of both realty and personalty, especially in view of declared intention by codicil "to modify the will so as to provide for my friend C."

8. WILLS—CONSTRUCTION—INCONSISTENT CLAUSES.—A following provision of a will inconsistent with the former provision governs, though they should be harmonized if possible.

9. WILLS—CONSTRUCTION—RIGHTS OF RESIDUARY' LEGATEES.—Where testatrix devised lands to individuals to be divided among them share

and share alike, and also provided a residuary clause, and one of the individuals predeceased her, the devise was realty at the time of testatrix's death and passed to the residuary legatees.

Before WILSON, J., Edgefield, Spring term, 1917. Modified, affirmed and remanded.

Suit by Ione T. Kirkland and others against John S. Moseley, as executor of Angelina Bacon, deceased, and others. Decree dismissing the complaint, and plaintiffs appeal.

The decree of the Circuit Judge is as follows:

This important equity case came on to be heard before me at a recent session of the Court at Edgefield, and was heard upon the testimony, oral and documentary, as taken by the master, under an order of reference to take testimony. The case was thoroughly and fully argued by counsel on all sides, and the evidence, and the arguments, and the authorities, have been duly considered by me, and it is now my duty to state my conclusion of fact and law in the matter.

The action is brought by Ione T. Kirkland, H. Spann Toney and William Toney, as plaintiffs, on behalf of themselves and the defendant, Harriet T. Boatwright, to set aside, on alleged grounds of misapprehension and mistake, the contract entered into between them and Harmon C. Moseley on the 30th day of December, 1913, and certain quitclaim deeds executed between the parties very soon thereafter, in January, 1914—which papers will be more fully set forth hereinafter.

Harmon C. Moseley departed this life before the commencement of this action, leaving a will, and his personal representatives, his widow and other devisees under his will, and D. S. Henderson and Croft & Croft and J. M. Steadman, interested as mortgagees, under mortgages given by him upon the subject matter of this action, are defending this action; and hereafter these contestants will be designated

as the Toneys, plaintiffs (because they are descendants of
Mark Toney), and the Moseley defendants,—this for sake
of brevity.

The witnesses who testified in the case were few in num-
ber, and the facts of the case derived from the testimony of
these witnesses and the documentary evidence put in are not
controverted to a great extent, and are clear and distinct.
From all of the evidence I find the facts to be as follows:

Harmon Gallman, late of the county of Edgefield, being
the owner of two tracts of valuable land therein, one known
as the 400-acre tract and the other as the 500-acre tract, by
deed executed on April 30, 1870, and duly recorded, under-
took to convey these two tracts of land. The first tract
was conveyed with the following clause therein contained:

"To have and to hold said land to the said Angelina M. J.
and Thos. G. Bacon during the term of their natural lives
(not to be liable for the debts of the said Thos. G. Bacon),
and after the death of either of them, then to the survivor
in fee."

The same deed undertook to convey the second tract of
land with the following clause:

"Unto the said Angelina M. J. and Thos. G. Bacon for
and during the term of their natural lives, or the life of
either of them, all and singular the remaining moiety of the
land, including the homestead I now live at. * * * To have
and to hold the said last named tract to the said Angelina M.
J. Bacon and Thos. G. Bacon, during the term of their
natural lives, or the lives of either of them, afterwards to
revert back to my estate and be distributable among my next
of kin."

Old man Gallman died in 1871, leaving no brother and
sisters then living, but a number of nephews and nieces,
including the one named for him, Harmon C. Moseley, and

he left one child, Angelina, the wife of Thos. G. Bacon. Thos. G. Bacon died before his wife. Under this deed she went into possession of both of these tracts of land. During her lifetime she undertook to convey the 400-acre tract to several parties, reserving a life estate in herself, and she kept possession up to the time of her death, using and controlling the same. It went by intermediate conveyance to Mark Toney, the father of the Toney claimants.

Angelina died on December 6, 1913, leaving no children or grandchildren, or other direct descendants, but some cousins who will be referred to hereafter. She left a will, dated November 6, 1907, with a codicil thereto, dated October 4, 1912. By this will, although she had declared that she did not believe that she owned but a life estate in the 500-acre tract, she devised it to five of the children of Mark Toney, naming them,—William Toney, Dantzler Toney, H. Spann Toney, Harriet Toney and Ione Kirkland. The terms of this will will have to be more specifically entered into hereafter. Upon her death, in December, 1913, there arose three separate sets of claimants to these two tracts of land, the 400-acre tract and the 500-acre tract, covered by the deed of her father, Harmon Gallman.

Dantzler Toney, one of the devisees in her will, had died previous to her. The Toney children, called the Toneys, asserted claim to both of these tracts. So did Harmon Moseley, who resided in Charleston, he claiming as next of kin of Harmon Gallman at the date of the death of Mrs. Bacon in December, 1913. Numerous grandnephews and grandnieces, in number perhaps 40, by the names of Arthur. Kissick, Boyce, Pruitt, and others, also asserted claim to both tracts of land under the terms of the deed aforesaid.

In this situation of affairs negotiations of a friendly nature were begun between the Toneys, as represented by well known counsel, Mr. J. C. Sheppard representing William and H. Spann Toney, Mr. B. E. Nicholson represent-

31—109.

ing Mrs. Boatwright, and Mrs. Kirkland being at first
represented by her own husband, J. Ham Kirkland, Esq ,
and afterwards by J. W. Cox, Esq.; and Harmon C. Mose-
ley, the acknowledged next of kin at the date of Mrs.
Bacon's death, being represented by D. S. Henderson, Esq.
All of the testimony shows that in these negotiations, and in
the fruition thereof, as expressed by the compromise and
deeds, hereinafter referred to, was the most open discus-
sion, no concealment, no fraud, no misrepresentations, no
improper inducements, and a frank avowal of opinions and
doubts on both sides as to the claims of the respective
claimants, and a desire to get together and compromise their
rights on a proper and equitable basis, so as to be able to
contest any position or claim that may be made by the
grandnephews and grandnieces, to either or both tracts of
land, said grandnephews and grandnieces being represented
by eminent counsel. One or two meetings were held between
counsel and some of their clients at Edgefield, where the deed
in question was discussed and the claims of both parties. An
arrangement was made mutually acceptable, and at the
expense of both parties, to have both tracts of land run out
by a surveyor, so that when they met again it could be
understood how many acres were contained therein, as a
hopeful basis of settlement. Such survey was made, and
it was ascertained that the 400-acre tract turned out to
have 421 acres, and the 500-acre tract turned out to have
559 acres. These lands are situate in a few miles of John-
ston, in the county of Edgefield,—and the parties met there
with their attorneys on the 30th day of December, 1913, for
the purpose of consultation and compromise if the same
could be reached on a reasonable and just basis. Harmon
C. Moseley, who was an aged man, about 80 years of age,
appeared at this meeting with his counsel, Mr. Henderson,
Mr. Sheppard, representing William Toney and H. Spann
Toney,—H. Spann Toney being present in person. Mrs.
Kirkland was represented by her husband, Mr. Kirkland,

and in part by J. W. Cox. Mrs. Boatwright was represented by her husband, Mr. B. T. Boatwright. Mr. Nicholson was present, but as he had already given his opinion in the matter, and did not desire to take part in the settlement and in the negotiations, he in this conference represented none of the parties, but was present by the request of Mr. Boatwright,—Mr. and Mrs. Boatwright having been previously informed by Mr. Nicholson of his opinion of the deed, and their rights thereunder, and they being satisfied with his opinion in the matter. After considerable negotiations between the parties, and a visit to the lands in question, and after offers backwards—and forwards as to different quantities to be conveyed from one to the other, it was agreed amicably and in a friendly manner to exchange quitclaim deeds,—Mr. Moseley quitclaiming his right, title and interest to the Toneys in 490 acres of land, comprising the 421-acre tract and 69 acres from the 500-acre tract,—and the Toneys in consideration of the settlement and of obtaining deeds from Mr. Moseley quitclaiming to him all of their right, title and interest in 490 acres of the original 500-acre tract. On said day a written agreement, carefully drawn, and reciting all of the facts referring to the original deed and Mrs. Bacon's will, and the differences between the parties, was drawn and witnessed. Some of the original parties, namely, William Toney, Ione Kirkland and Harriet T. Boatwright, were not present, but their representatives signed this paper for them. In a few days thereafter all of the parties, Moseley on the one side, and the Toneys on the other side, executed carefully prepared quitclaim deeds, the preambles of which fully recite and show full knowledge on the part of all of the parties of their claims in the matter. Immediately upon the execution of the compromise agreement, the Toneys took possession of the land quitclaimed to them, including the 69 acres of the original 500-acre tract; and Moseley took possession of the 490 acres

quitclaimed to him, and everything seemed amicable and friendly among each other.

I find from the testimony, as a matter of fact, that Mr. Sheppard, in a most careful, attentive and painstaking way, endeavored to discharge his duty toward his clients, who were not only his clients, but the descendants of his friend, Mark Toney. He went to the trouble and precaution of going to Columbia, and getting the advise of that eminent member of the bar, Robert W. Shand, Esq. They considered carefully what construction ought to be put upon the various clauses of the Gallman deed, as affecting the rights of the Toneys. They came to the conclusion as an opinion of counsel that the Toneys could probably recover both tracts of land on the view that Mrs. Bacon, notwithstanding the technical wording of the deed, was the heir at law of her father, Harmon Gallman. This opinion was conveyed to their clients in no uncertain, but in express language, Mr. Sheppard going so far as to offer to take the litigation on a contingent fee of what was recovered, and to be paid nothing if he recovered nothing. All of this was in good faith, but he and Mr. Shand both held the opinion that they did not know finally what construction the Courts would put upon the various clauses of the deed, and that in order to reach an amicable arrangement with Mr. Moseley and to fight the common enemy, the grandnephews and grandnieces, that it would be a wise thing to settle upon the intention of Mr. Gallman as expressed in the deed, that intention being that the 400-acre tract went to Mrs. Bacon, and the 500-acre tract to his next of kin at the death of Mrs. Bacon, but inasmuch as the deed used the expression "the other moiety," the Toneys, through Mr. Sheppard, insisted that they should receive from the 500-acre tract enough to make them equal in quantity, and after some demur on the part of Mr. Moseley, he having been advised by his counsel that whilst he had a reasonable belief and entertained the opinion that he could recover both tracts from all parties in question, he conceded

69 acres, and the compromise and quitclaim deeds were made upon that basis.

I further find that soon after these deeds were executed and delivered, to wit, on the 29th day of January, 1914, one of the grandnephews, named Arthur, brought an action in the Court of Common Pleas of Edgefield county to recover an undivided interest in both of these tracts of land, fully contesting the title of Moseley and the Toneys to both tracts of land. Issue was joined in this action, but it seems not to have been pressed, but was consolidated, and the counsel therein appeared afterwards with other eminent counsel in the action known as *Boyce v. Moseley,* in which action Boyce, one of the grandnephews, on behalf of himself, and all other nephews and nieces in like plight, endeavored to recover possession of the 500-acre tract, 490 acres of which was in possession of Moseley and 69 acres of which was in possession of the Toneys. They, by their counsel, answered the complaint in said action, as did Moseley. In their answers they both set up two distinct sources of title, one the title of Moseley as next of kin under the Gallman deed, and the other, the title derived by the Toneys from Mrs. Bacon under her will, she having been the only child of Gallman.

This action of *Boyce v. Moseley* being pending, came on for trial before his Honor, Judge Memminger, and a jury, at the March term, 1915. Moseley, and his attorneys, and the Toneys, and their attorneys, fought together to defeat the claim of the grandnephews and grandnieces, represented by a considerable number of attorneys. During none of this litigation does it appear that any contest was made as between the Toneys and Moseley, that there was anything improper or that any mistake was made in the compromise and quitclaim deeds as aforesaid. Judge Memminger directed a verdict of 490 acres for Moseley, and 69 acres for the Toneys. In his charge to the jury he distinctly recog-

nized both titles as set up in the answers of the various parties as valid. Judgment was entered, and appeal was taken to the Supreme Court,—the action of the Supreme Court being set forth in an opinion by his Honor, Judge Gage, in 102 S. Car., p. 364, which decision was filed on October 30, 1915. In said decision the Justice delivering the opinion,—and giving the judgment of the Supreme Court, page 372, announced:

"We think the Circuit Court's view of the law of the case, briefly but comprehensively expressed, is true; and the judgment of that Court is affirmed."

The decision of the Supreme Court held that the Toney title was a better title, that the deed in question was a common law deed, that the next of kin took as of the date of the death of Gallman, but inasmuch as there were no words of inheritance in the deed, these next of kin only took life estates, and that Mrs. Bacon being the only child of Gallman, took the fee, and that Moseley being the only surviving next of kin at her death, got a life estate, and her devisees held the fee, and that when they quitclaimed to Mr. Moseley they put the fee in him as to the 490 acres, and they held the fee as to the 69 acres, he having quitclaimed to them.

No decision was made, and none attempted to be made, because it was not involved in the issue joined, as to what right or title Moseley had in the 400-acre tract, but at page 366 the Supreme Court, speaking of the matter, says:

"The view would compel a construction of the grant of the first parcel, a matter which is not before us, and a matter about which there might be two opinions of counsel."

I find further that the Toneys divided up the 69 acres, and the 421 acres, among themselves. William Toney has sold out his entire interest therein for considerable value. Mrs. Kirkland has parted with her interest for considerable

value,—and so, also, H. Spann Toney. Their holdings therein are now held by some outsiders. Mrs. Boatwright holds what was coming to her, and perhaps H. Spann Toney still owns a small portion of his land.

I find further that Moseley relied upon the quitclaim deeds as aforesaid, and the compromise therein contained, entered into considerable obligations and mortgaged the share of the property deeded to him, said mortgage being made to his counsel for services performed, and to be performed and money loaned. That he took possession of the property, and that same was rented for him and superintended by H. Spann Toney; that after his death, and after the decision of the Supreme Court, his widow, Mrs. Rebecca S. Moseley, moved from Charleston with some of her grandchildren, and settled on the place in question.

I find, as a matter of fact, that the compromise evidenced by the paper of December 30th, 1913, and the quitclaim deeds made in pursuance thereof soon thereafter, was upon an honest view entertained by the opposing parties of their respective titles, and under the advice of eminent counsel. That the views entertained were honest and conservative, and that the doubts of counsel on both sides as to the construction of the deed, was of such a nature as to justify the parties in settling their claims as the best thing to be done under the circumstances.

These being the facts in the case, the next question to be considered is what is the claim of the claimants, and what is the law as applicable to these facts that must be determinative of the controversy between the parties.

No fraud or undue influence, or concealment, or misrepresentation is charged in the complaint, and if there was such charge made the facts show nothing of the kind. Eminent counsel for the Toneys claimed orally at the bar, and in able argument filed, that,—

"Moseley obtained something for nothing, and to allow him to retain it would be to allow him to retain an undue and unconscionable advantage out of that which was at the very best a mistake of law on the part of the Toneys. And it must have been a mutual mistake on the part of Moseley; otherwise, he would be in the position of taking advantage of their mistake."

In other words, it is contended that there was a mutual mistake of law between the parties to the compromise, and that as the decision of the Supreme Court in *Boyce v. Moseley* declared the Toneys' title the better, the Toneys should be relieved in equity, because the consideration was very valuable which they deeded away, and that the quitclaim deed should be cancelled upon that basis.

The authorities relied on by complainants' counsel, among others, are: *Whitehill v. Dacus,* 49 S. C., p. 277; *Laurence v. Beaubein,* 2d Bailey, p. 223; *Lowndes v. Chisolm,* 2d McCord Chancery, p. 461; *Hutchinson v. Fuller,* 67 S. C., p. 285.

These authorities unquestionably established the position, that in general a mistake of law mutually made by parties to the transaction will in equity be relieved, but it is clear from the authorities, especially from the opinion of Chief Justice Jones in *Whitehill v. Dacus,* 49 S. C., p. 277, that the mistake must be "a mutual mistake in law;" and the decision of Judge Woods in *Hutchinson v. Fuller,* 67 S. C., p. 285, that the mistake of law must be "on both sides." I do not find existing a mutual mistake of law as shown by the sequel of this transaction,—namely, the result of the decision in *Boyce v. Moseley.* That case holds that the Bacon title was the best, because Mrs. Bacon was the heir at law of Gallman. Now, the facts clearly show that the Toneys knew that. That they were so advised by their eminent counsel beyond question, and if they did not grasp that advice the mistake was entered into by negligence, and

they cannot take advantage of it. Governor Sheppard dis-
tinctly testified that after the decision of the Supreme Court,
Mr. Kirkland declared to all of the Toneys,—"you cannot
blame Mr. Sheppard for it, because he told you at the start
that in his opinion he could get the whole business;" and
this is not denied by Kirkland.

It may be that according to the decision of the Supreme
Court Mr. Henderson was wrong in his opinion that Mr.
Moseley as next of kin could recover the land, but this does
not make it a mutual mistake on the part of the parties, such
as is contemplated by the foregoing decisions.

Even, however, if there were a mutual mistake of law
clearly demonstrated and beyond question, the authorities in
South Carolina hold beyond question that a mutual mistake
of law, arising from the construction of a deed or will,
is not relievable in equity, for the simple reason that the
parties must not rely on their own opinion, or the opinion
of counsel in that matter, but must investigate for them-
selves. They can go to the Court and obtain their views,
and if they enter into contracts on that basis there is no
relief for them.

In the case of *Cunningham v. Cunningham,* 20 S. C., p.
332, after considerable discussion and consideration the
Supreme Court has settled this matter. They refer to the
cases relied on by counsel in this action,—*Laurence v. Beau-
bien, Lowndes v. Chisolm, supra,* and also, *Hopkins v. May-
zick,* 1st Hill, p. 251—and whilst recognizing that in gen-
eral a mutual mistake of law is relieved in equity, they hold,
basing their decision upon the decision of the old Court in
the case of *Keitt v. Andrews,* 4th Richardson's Equity,
p. 349, "That the misconstruction of a deed or will is not
to be regarded as coming within the scope and authorities
of those cases where mistakes of law as *contra* distinguished
from ignorance of law, have been considered as affording
grounds of relief."

And they state, following this enunciation of the law, "In this view the Court concurs and holds that even if there is a difference as to ignorance of law and mistake of law, and it should be regarded as in fact true that Pamela Cunningham had formed an opinion, either from her own construction of this will, or in consequence of erroneous advice of others, this is no ground on which this Court can relieve her devisees from the effect of those solemn deeds, executed in 1875."

This doctrine here announced has been fully sustained in several cases. Among others, the following: *Monroe v. Long,* 35 S. C., p. 360; *Smith v. Winn,* 38 S. C., p. 191; *Brock v. O'Dell,* 44 S. C., pp. 30-41; *Hutchinson v. Fuller,* 67, S. C., p. 285; *Smith v. Linder,* 77 S. C., p. 542.

This being the law, whilst it may be so in the sequel of this transaction under the decision of the Supreme Court in *Boyce v. Moseley,* it may appear that the Toneys have parted with more of value than Moseley deeded to them, I am obliged to follow the principles of law as recognized on the equity side of the Court, and hold that there is no such mistake of law herein, as gives them any relief.

But it is my duty to pass upon the other questions that have been raised by the pleadings and the arguments in the case. Counsel for Moseley insist that this compromise, stated as aforesaid, was an honest compromise without fraud and concealment, misrepresentation or evasion, upon the basis of an honest entertainment of different views as to their titles, and upon the basis that the claims made were honestly considered and were doubtful, and such a compromise, outside of any question of mistake, whether the same be unilateral or mutual is conclusive as a bar against any claim for relief as against such a compromise. Of course, compromises can be set aside for fraud, but if they are free from fraud, and there is simply involved therein the idea of mistaken impression and mistaken belief, or mistake of

law, or mistake of fact, it seems that the authorities are abundant that there is no relief for the parties entering into the same.

In Kerr on Fraud and Mistake in Law, page 403, the matter is thus stated:

"Mistake in law is not a ground for setting aside a compromise if the parties to the transaction were in difficulty and doubt and wish to put an end to disputes, and to avoid litigation. If one or more parties, having or supposing they have claims upon a given subject matter, or claims against each other, agree to compromise these claims, and the knowledge or means of knowledge of each of them with respect to the mode in which and the circumstances under which his claim arises, stand upon an equal footing, and there is an absence of fraud or misrepresentation, the transaction is binding, although the conclusion at which the parties may have arrived is not that which a Court of Justice would have arrived at had its decision been sought. The real consideration which each party receives under a compromise being, not the sacrifice of the right, but the settlement of the dispute, and the abandonment of the claim, and it is no objection to the validity of the transaction, that the right was really in one of the parties only, and that the other had no right whatever."

To the same effect is section 121, Story's Equity Jurisprudence, where, among other things, it is stated:

"Where a doubtful question arises, such as a question respecting the true construction of a will, * * * and a compromise if fairly entered into, with due deliberation, will be upheld in a Court of equity as reasonable in itself, and to determine the differences by dividing the stake; and as supported by principles of public policy."

And, also, in section 131: "If such compromises are otherwise unobjectionable, they will be binding, and the right will

not prevail against the agreement of the parties; for the right must always be on one side or the other, and there would be an end of compromises, if they might be over-thrown upon any subsequent ascertainment of rights contrary thereto. If, therefore, a compromise of doubtful right is fairly made between parties, its validity cannot depend upon any future adjudication of that right. And where compromises of this sort are fairly entered into, whether the uncertainty rests upon a doubt of fact, or a doubt in point of law, if both parties are in the same ignorance, the compromise is equally binding, and cannot be affected by any subsequent investigation or result."

To the same effect is 2d Pomeroy's Equity Jurisprudence, section 849 and section 850, and section 855. Section 849, *supra,* discusses the cases in which relief will be given in unilateral and mutual mistakes of fact and of law, and Mr. Pomeroy closes the section with this observation:

"It should be carefully observed that this rule has no application to cases of a compromise, where doubts have arisen as to the rights of parties, and they have intentionally entered into an arrangement for the purpose of compromising and settling those doubts. Such compromise, whether involving mistakes of law or of fact, are governed by special considerations."

The authorities in our State are abundant upon this subject, and I will refer to a few,—*Durham v. Wadlington,* 2d Strobart's Equity, p. 258. In this case the opinion was delivered by Chancellor Dunkin, who presided on the Circuit, and his decision was sustained by the unanimous Court. The facts are interesting and quite similar to the case at bar. At page 261, he says: "The principle of law applicable to this case is comprised in 131 Story's Equity," and, among other things, states, "Where a compromise of a doubtful right is fairly made between the parties, whether the uncertainty rests upon a doubt of fact,—or a doubt in point of

law, if both parties are in the same ignorance, the compromise is equally binding, and cannot be affected by any subsequent investigation and result."

The Lost Bond Cases, 15 S. C., p. 231, are to the same effect. In that case the authorities are collated and commented upon by Judge McGowan, and he remarks: "The word compromise involves the idea of a surrender of right. If the parties intended the settlement as a composition or compromise of a doubtful or disputed right, the Court will not, on the sole ground of mistake, set it aside." *Deal v. Deal*, 91 S. C., p. 351.

Chief Justice Gary, at page 375, in commenting on this very subject, quotes with approval, 8th Cyc., p. 307, and 6th Encyclopædia of Law, p. 731,—and enunciates the doctrine which applies to this case: "That the real consideration which each party receives under such a compromise is, according to some authorities, not the sacrifice of the right, but the settlement of the dispute."

It seems to the Court that compromises are favored in the law, and the effort of parties to compromise is encouraged. In civil cases, if efforts are made to compromise, and it is not reached, and litigation follows, the efforts of compromise are not allowed in evidence, and it would follow that when a compromise is reached, if it is honest, and without fraud, and of a doubtful or disputed right, it should be sustained. This compromise was made after considerable endeavor. It was made upon the advice of counsel. It was made to get ready to fight a common enemy, and it was made upon the basis of what was the intent of Mr. Gailman in his deed of 1870, and in the settlement the Toneys obtained more land than really he intended to go to Mrs. Bacon absolutely, and whilst it may appear now that they parted with more of value than Moseley parted with, still the compromise should be, and is sustained, and being so sustained, the compromise of the 30th of December, 1913,

and the quitclaim deeds made after the contract of that date, in pursuance thereof, are valid, and the Court declines in the exercise of its discretion to cancel and set aside the same.

The Moseley defendants insist in their answer and in their argument, that the Toneys, by their conduct in joining with them in the common fight against the grandnephews and grandnieces, and in inducing old man Moseley to place encumbrances upon this property, and obligating himself in large amounts to his counsel for their services, it estopped from asserting title to the property in question; and they also insist under the maxim in equity, that he who seeks equity should do equity, that the Toneys cannot restore the *status quo*, and hence that they are barred in this action. These are interesting questions, but in view of the two questions hereinbefore previously considered and determined, and to which the Court holds with confidence, I do not consider it necessary to pass upon these questions.

On this branch of the case, it is ordered, adjudged and decreed that the prayer of the plaintiffs, on their own behalf, and in behalf of Mrs. Boatwright, who has defaulted in this action, to set aside the deeds made by them to Harmon C. Moseley, in January, 1914, to the tract of land described in the complaint as 490 acres, be, and the same is hereby, denied, and it is declared that the said tract of land belonged in fee simple to Harmon C. Moseley, and passed under his will to his devisees therein named, subject to the lien of the mortgages to the defendants, D. S. Henderson, Croft & Croft and J. M. Steadman, hereinafter referred to.

It now remains to consider the question as to the one-fifth interest in said tract of 490 acres, raised by the defendant, Mrs. Anna G. Mobley, and the defendants, Mrs. Carolina V. Wright and Mrs. Angeline B. Harrison.

Mrs. Bacon, in her will dated the 5th day of November, 1907, devised this 500-acre tract as follows:

"To William Toney, Ione Kirkland, Harriet Toney, H. Spann Toney and M. Dantzler Toney, children of my friends, Mark Toney and Mary H. Toney; the said tract of land to be divided among the said five children, share and share alike, and in fee."·

And she adds: "In making this devise, I exclude Mark Toney, the youngest child of my friends, Mark and Mary H. Toney, for the reason that he is so generously provided for in the will of his father."

Then comes a residuary clause in which all of her property of every kind and description whatsoever, and whereso-ever situate, is given to Mrs. Carolina V. Wright and Mrs. Angeline B. Harrison. She subsequently added a codicil to that will, dated the 4th day of October, 1912, in which she makes immaterial changes in her will, but she changes the residuary clause in a material particular. She gives therein five hundred dollars to her friend, Chas. D. Kenny, after stating that the rest and residue of her property is given to Mrs. Harrison and Mrs. Wright, and she adds: "My purpose being to give all of my personal property of every kind to these two ladies, except the sum of $500, to be paid to Chas. D. Kenny."

·During the litigation in the case of *Boyce v. Moseley, supra,* it does not appear that any one made any claim to this one-fifth interest, which is called for convenience sake the Dantzler Toney interest, but that the other four children of Mark Toney, considering that they were the survivors of the five named, quitclaimed their interest in this land to Moseley.

Now, Mrs. Mobley contends, and it is admitted, that she is a first cousin of Mrs. Bacon, who died without any imme-diate descendants, and that Mr. Moseley is her first cousin, and that Dantzler Toney having died before Mrs. Bacon, the interest which was devised to him lapsed, and that she

died intestate as to the same, and that it goes to herself in the proportion of one-tenth and to Mr. Moseley in the proportion of one-tenth as the next of kin of Mrs. Bacon.

On the other hand, Mrs. Wright and Mrs. Harrison, the ladies under the residuary clause of the will, claim that this one-fifth interest lapsed, but that it was not intestate property, and that it passed to them under he residuary clause of the will. Still, however, the Moseley defendants claim that there was no lapsing of the devise,—that the devise was one to a class,—namely, the children of Mark Toney, excepting young Mark, and that when Dantzler died, it went to the survivors of the class, and passed from them by their quitclaim· deeds to Moseley. In this contention of the Moseley defendants, the plaintiffs in this action join, but, of course, they claim that it should remain in them if the compromise had been set aside.

This interesting question has been learnedly discussed, and it will now have to be determined by the Court. Was the devise a devise to a class, or was it a devise to individuals as tenants in common? Was it a devise to the children of Mark Toney collectively, or a devise to them individually? In the construction of wills the cardinal rule is to ascertain the intention of the testatrix, not only from the words of the will, but from her surroundings at the time. This doctrine is clearly and fully stated by Judge Hydrick in the decision of the Supreme Court in *Burris v. Burris,* 104 S. C., p. 445, as follows: "The first and most imperative,— that to which all others are subservient,—is that we must ascertain the intention, and, having done so, effect must be given to it, unless it conflicts with some settled rule of law. Another cardinal rule is that, in ascertaining the intention, the will must be read as a whole, and force and effect must be given to all parts of it, every clause, phrase, and word, if it can be done by any reasonable method of construction, so as to harmonize them with each other and with the whole,

and in doing this technical words used must have their sense, unless it clearly appears from the context that they were intended to have some other meaning.   All the rules of construction are intended to operate harmoniously in their application, and they will rarely conflict with each other, except when erroneously applied."   And, "The testator's purposes, as disclosed by the will, must prevail, even though it involve the rejection or addition of words, or their restraint from their usual meaning."   *Clark v. Clark,* 19 S. C., p. 352, and also, *Dillard v. Dillard,* 95 S. C., p. 87.

What was Mrs. Bacon's intention in making this devise? It should be noted that the testimony shows that she owned or claimed no other real estate than this; that Dantzler Toney was a bachelor; that some of the other Toneys, William and Spann, and Mrs. Kirkland were married and had children.   Especially it should be noted that Dantzler died in 1911, between the date of the will in 1907, and the date of the codicil in 1912.   That she knew of his death, and that when she made the codicil if she had intended that the devise should be made to Dantzler individually, and not one as a class, she did not mention this one-fifth interest in the codicil, but that the codicil undertakes to dispose entirely, under the residuary clause, of personal property.   It should be also noted that in the words of the devise, there is no provision made that the shares or portions to each devisee should go to children, if they have any, though some of them had children well known to her.   The mere making of a devise that the property covered, should go to devisees named, and that it should be divided among them, or between them, share and share alike, is not conclusive that the testatrix intended it to be a devise to parties individually, and not collectively, but the presumption can be overcome by the clear intention of the testatrix,—ascertained otherwise and to the contrary, and I am convinced, after considering the will itself and the facts and the circumstances surrounding Mrs. Bacon, that she intended to give this property to the

32—109.

five children of Mark and Mary H. Toney as a class.—naming them as such, and that one of the clearest indications thereof is that she specifically says that she does not include young Mark Toney, so that excluding young Mark she gives it to the others as a class.  This doctrine of construing words of a will, and whether it be given to parties as a class or individually, and that the same is governed by the intention of the will is clearly recognized by the following cases: *Rivers v. Rivers,* 36 S. C., p. 309; *Clark v. Clark,* 19 S. C., p. 345.  This doctrine is well sustained elsewhere. Our Court, in the case of *Buist v. Walton,* 104 S. C., p. 99, refers with approval to the case of *Schaffer v. Kettell,* 14 Allen (96 Mass.), p. 528; which is conclusive of this principle, and that case is bottomed upon the case of *Johnson v. Roberts,* 14 Gray (Mass.), p. 546.

The Court should not readily declare an intestacy, when the testatrix has undertaken to devise all of her property, the doctrine being, "It is not the policy of the law to declare a partial intestacy, if the will can be construed to prevent it." *Wilburn v. Townsend,* 31 S. C., p. 408.

My conclusion is that it was the clear intention of the testatrix, and that she did devise this property to the children of Mark Toney as a class, as named in her will, and that when Dantzler Toney died, the share attributed to him did not lapse, but—when to the survivor of the class, and that those survivors deeded the same,—having acquired it in this way,—to Mr. Moseley when they executed their quitclaim deeds to him.  This right of survivorship does not come to the surviving members of the class by implication, but is attributed to them under the law regulating devises to classes.

It still remains to dispose of the position taken by the parties to whom Mr. Moseley made mortgages.

To D. S. Henderson he made two mortgages on the land in question, one dated the 12th day of January, 1914, secur-

ing an obligation of equal date for $10,000 for services rendered and to be rendered, and not drawing interest The other dated the 16th day of November, 1914, for $500, borrowed money, drawing interest from date at 8 per cent. per annum, payable annually. These mortgages are unpaid, and I find that they are due and payable to the defendant, D. S. Henderson, according to their tenor and effect as stated aforesaid.

The other mortgage was given on the 24th day of January, 1914, to the defendants, Croft & Croft, for $4,500, of which $4,000 was for services rendered, and to to be rendered, and did not draw interest, and $500 was for borrowed money loaned at said date, and to draw interest at the rate of 8 per cent. per annum until paid. This mortgage has been transferred for valuable consideration to the defendant, J. M. Steadman,—and I hold that said amounts as aforesaid are due and payable on said mortgage to the said J. M. Steadman, as assignee of Croft & Croft.

Wherefore, it is ordered, adjudged and decreed:

First. That the costs of this action be paid by the plaintiffs. Ione T. Kirkland, William Toney and H. Spann Toney, the same to be taxed by the clerk of the Court, and judgment to be entered up therefor and execution issued.

Second. That the tract of land described in the complaint as 490 acres be, and the same is hereby, declared to be the property of the estate of Harmon C. Moseley, and to be distributed according to the provisions of his will, which has been put in evidence in this action, subject, however, to the lien of the mortgages to D. S. Henderson and J. M. Steadman, as hereinbefore stated, according to their dates.

Third. That the complaint is not dismissed, but that the action is retained and leave is given to the defendants, D. S. Henderson and J. M. Steadman, to apply at the foot of this decree to the Judge of the Eleventh Circuit, or the Judge

presiding in the Eleventh Circuit, at chambers, or other-
wise, for a decree for foreclosure of their mortgages if they
be so advised. (Signed) John S. Wilson, Circuit Judge.
Manning, S. C., May 11, 1917.

I, W. B. Cogburn, clerk Court C. P. and G. S. in and
for Edgefield county, S. C., do hereby certify that the fore-
ging is a true any exact copy of a decree of Judge Wilson
as the same is now on file in my office. W. B. Cogburn,
C. C. C. P. & G. S.

*Mr. D. W. Robinson,* for plaintiffs-appellants, cites: *As
to evidence of mistake:* 1 Strob. Eq. (20 S. C. Eq.) ; 74 S
C. 48-9; 40 S. C. 475-6; 106 S. C. 19; 15 S. C. 284; 88 S
C. 299; 20 S. C. 333-4. *As to real consideration for con-
tract and transfer:* 102 S. C. 361. *As to the law governing
this deed:* 102 S. C. 369; 1 Strob. Eq. (20 S. C. Eq.) 115;
38 S. C. 18; 21 S. C. 513; 87 S. C. 529; 104 S. C. 427; 97
S. E. 377-8; 106 S. C. —; 33 L. R. A. (N. S.), Mass., pp.
4-5; 102 S. C., pp. 370-371; 39 S. C. 18; 51 S. C. 557; 40
S. C. 475; 36 S. C. 301; 32 S. C. 85; 48 S. C. 347-349-350;
44 S. C. 31-2; 67 S. C. 285. *As to mistake of law as to
private property rights being ground for relief:* 60 S. E.
736; 15 L. R. A. (N. S.) 1038-42, and cases in note; 2
Pom. Eq. Juris. (3d Ed.), sec. 849; 207 Mass. 525; 32 L.
R. A. (N. S.) 340; 125 Ga. 699; 54 S. E. 706; 28 L. R.
A. (N. S.) 785; 202 Mo. 605; 10 L. R. A. (N. S.) 1205;
93 Miss. 732; 25 L. R. A. (N. S.) 184; 67 S. C. 285; 49
S. C. 277; 2 Bail. L. (18 S. C. L.) 647; 2 McC. Ch. (7 S.
C. Eq.) 461-2; 1 DeS. Eq. (1 S. C. Eq.) 444-5; 2 DeS.
Eq. (2 S. C. Eq.) 144; 3 DeS. Eq. (3 S. C. Eq.) 86; Bailey
Eq. 340; 1 Hill Eq. 251; 2 S. C. 177; 20 S. C. 352; 35 S. C.
243; 11 S. E. 496; 44 S. C. 34; 1 McC. Ch. 352; Finch's
Law, Book I, Ch. 3; 141 U. S. 260; 35 L. Ed. 288; 208
Fed. 923-5; 8 Wheat 214-15; 5 L. Ed. 599-600; Pomeroy
and Bispham's Eq., sec. 125; 180 Pa. St. 165; 57 Am. St.
Rep. 625-8, and note; 4 Rawle, 141; 26 Am. Dec. 125; 10

R. C. L. 1059. *As to compromise:* 6 Enc. of Law, p. 418;
55 Vt. 301, 399; 90 N. W. 338-339; 116 Iowa 535; 52 S.
C. 253-4; Addison on Const. 13; 1st Chitty 46; 32 Atl.
(Pa.) 563; Story's Equity Jurisprudencer sections 121 and
122; 91 S. C. 375; Story Eq. Jurisprudence 125 and 130;
2 Bail. Eq. (18 S. C. L.) 647; 60 S. E. 736; L. R. A. (N.
S.) 1042-4; 67 S. C. 281; 2 McC. Ch. (7 S. C. Eq.) 461-2;
1 DeS. Eq. (1 S. C. Eq.) 444-5; 52 S. C. 252; 35 L. Ed.
689. *Unfounded claim:* 2 Pomeroy Eq. Juris. (3d Ed.),
sec. 850; Paige on Contracts, sec. 321, p. 494; Kesler's Est.,
24 Am. St. Rep. 557; 13 L. R. A. 581, and note (Pa.); 97
Am. Dec. 357-8 (Mo.); 79 Am. Dec. 456; Pollock Cont.
161; 6 N. Y. 369; 15 C. B. 2, 95; Parson's Cont. 437; 8
Blackf. 415; 13 Pick. 284; 5 Pet. 114; 21 Pa. St. 237; 2
Moore 297; 14 Conn. 12; 4 Met. 270. *Change of status:*
86 S. C. 584; 52 S. C. 244; 207 Mass. 525; 32 L. R. A.
(N. S.) 345; 2 DeS. Eq. (2 S. C. Eq.) 143-4; 3 DeS. Eq.
(3 S. C. Eq.) 85-6; 2 McC. Ch. (7 S. C.) 461-2; 49 S. C.
277; 67 S. C. 285. *Real equities are with plaintiffs:* 2 Bail.
L. (18 S. C. L.) 647; 1 Hill Eq. 251; 67 S. C. 285.

*Messrs. Hendersons,* for the representatives of the estate
of H. C. Moseley and his mortgagees, respondents, cite:
*As to the claim of the Toneys to upset and set aside the
compromise and deeds mutually passed pursuant thereto:*
20 S. C. 332; 4 Rich. Eq. 349-355; Story's Eq. Juris., sec.
197; Pomeroy's Eq. Juris., sections 850, 878; Adams' Eq.
369; 21 S. C. 237; 105 S. C. 211; 101 S. C. 235; 103 S. C.
500; 18 Wallace 149; 114 Ga. 155; 39 S. E. Rep. 943; 108
Ga. 372; 33 S. E. Rep. 981; 36 Ga. 191; 88 Ga. 321; 14 S
E. Rep. 556; 30 Ga. 630; 54 Ga. 348; 115 Ga. 655; 42 S. E.
Rep. 45; 52 S. C. 244-254; 32 Atl. Rep. 560; 102 S. C. 366.
*As to whether the devise, to the Toney children, was a devise
to a class or individuals:* 104 S. C. 345; 4 S. C. 76; 30th A.
&. E. Encyc. (2d Ed.), p. 718; 14 Allen 528; 14 Gray 546.

502          KIRKLAND *et al. v.* MOSELEY *et al.*

*Mr. J. Wm. Thurmond,* for Mrs. Anna L. Mobley, defendant-appellant, submits: *That M. Dantzler Toney, having predeceased the testatrix, the devise to him lapsed, and was inherited by the next of kin of Mrs. Bacon, to wit, the defendant, Mrs. Anna L. Mobley, and Mr. Harmon C. Moseley:* 13 Rich. Eq. 104; 3 Rich. Eq. 201; 36 S. C. 308; 30 Ency., 2d Ed., p. 718; 12 S. C. 576; 82 S. C. 402; Words and Phrases, vol. I, p. 768; 5 Rich. Eq. 90; 4 Ves. 551; 3 Ves. & Bean's Ch. 52; 1 Atkin 494; Strobhart's Eq., vol. IV, p. 181; 9th Rich. Eq., p. 244; 102 S. C. 361; 106 S. C. 304. *An estate by implication is created only from necessity:* 104 S. C. 446; 21 S. C. 531; 1 McC. Ch. Reps., p. 10; 102 S. C. 183; 3 Rich. Eq. 201. *Dantzler's inchoate interest did not pass under the residuary clause of the will:* 3 Rich. Eq., p. 201; 40 Cyc., pp. 156-8; Rich. Eq. 36; Harper's Eq. 117; 90 Am. St. Rep., p. 480; Cruise's Digest, til. "devise," c. 10, sec. 76; 2 L. D. Raym. 1324; 7 Taunt 79; 75 Am. St. Reports, p. 420; 29 Am. Rp., p. 258; 2 Rich. Eq., p. 27; 23 S. C. 269; 1 Strob. 96; 82 S. C. 256.

*Messrs. Thurmond* and *Ramage,* also for Mrs. Anna L. Mobley, cite: 57 Am. St. Reps. 529; Am. and Eng. Ency. of Law 61; 3 Jarman on Wills 8; Woemer's Am. Law of Administration, sec. 434; 17 N. Y. 561, 575; 23 N. Y. 366, 373; 80 Am. Dec. 290; 48 N. Y. 668; 3 Drew 593; 2 Cor. Ex. 190; Corop. 657; 11 Sim. 397; 57 Am. St. Reps. 529-532; Jarman on Wills, sec. 332; 150 N. Y. 90; 44 N. E 945; 168 N. Y. 169; 61 N. E. 166; 106 Va. 199; 55 S. E. 564; 17 N. Y. 561; 28 App. Div. 199; 50 N. Y. Supp. 1085; 67 Conn. 8; 34 Atl. 758; 59 N. Y. 262; 137 Am. St. Reps., pp. 110, 111, 113, 114; 5 Allen 249; 9 Allen 283; 7 Metc. 441; 1 Smed. and M. Ch. 589; 9 C. E. Gr. (N. J.) 512; 9 C. E. Gr. (N. J.) 277; 5 N. Y. 409; 4 Barb. 80; 3 Edwd. 79; 9 Paige 94; 6 Paige 600; — S. C. —; 20 Wend. 457; 4 Hawkes 215; 2 Murph. 326; 31 Leg. Int. (Pa.) 349; 3 Whart. 477; 30 Penna. St. 425; 36 Md. 168; 3 Jones Equity

14; 17 Md. 23; 4 Ired. Eq. 320; 4 Strob. Eq. 179; 3 Harv. & McH. 333; 4 L. R. Eq. 521; 1 L. R. Eq. 585; 6 Conn. 304; 2 Root 487; 15 Conn. 297; 44 Conn. 672; 18 Ga. 130; 72 Ill. 50; 1 Metc. (Ky.) 515; 3 Han. McH. 333; 14 Pick. 449; 3 Edw. 330; 4 Paige 115; 5 Paige 318; 1 Hill (N. Y.) 590, affirmed 7 Hill 346; 37 N. Y. 549; 2 Ashm. 12; 34 Legal Int. (Pa.) 13; 24 Ala. 295; 24 Ga. 84; 2 Roof 487; overruled in *Green v. Dennis* 6 Conn.; 1 Harring (Del.) 524; 1st Jarman on Wills, Am. Ed., 1880, p. 635 (note).

*Messrs. Grier, Park & Nicholson,* for Mrs. Carolina V. Wright and Angeline R. Harrison, appellants, cite: *As to devise to a class:* 40 Cyc. 1929; 21 S. C. 528; 23 S. C. 224; 1 Jarm. Wills 534; 44 S. C. 520; 137 Amer. St. Rep. 110; 157 Cal. 63; 106 Pa. 230; 17 N. Y. 1085; 67 Conn. 8; 34 Atl. 758; 59 N. Y. 202; 28 App. Div. 199; 50 N. Y. Supp. 1085. *As to lapsed devise:* 40 Cyc. 1925, 1927; 17 S. C. 428; 56 S. C. 11; 26 S. C. 450; 36 S. C. 308; 23 S. C. 258; 10 Rich. Eq. (31 S. C. Eq.) 538; Pomeroy's Eq., sec. 1144; 10 Rich. 538; Civil Code, vol. I, sec. 3559; 22 S. C. 101; 31 S. C. 412; 105 Ark. 558; 151 S. W. 1014; Amer. Ann Cases 1914d; 150 Cal. 604; 89 Pac. 345; 36 Ind. App. 543; 76 N. E. 488; 1 Cush. (Mass.) 107; 131 N. Y. 227; 30 N. E. 133; 16 Hun. (N. Y.) 76; 138 N. C. 520; 51 S. E. 109; 9 Pa. Dist. 262; 86 Va. 823; 11 S. E. 121; 106 Va. 109; 55 S. E. 564; 20 Wend. 498; 41 Barb. 51, affirmed; 34 N. Y. 201; 45 N. Y. 254. *As to residuary devises:* 10 S. C. 428; Jarm. 181; 1 Jarm. 665; 7 Rich. Eq. 328; 10 Rich. Eq. 263; 74 S. C. 48; 18 S. C. 100; 10 S. C. 414; 15 S. C. 358; 31 S. C. 412; 64 S. C. 274; 23 S. C. 269; 10 Rich. Eq. 538; 31 S. C. 412; 64 S. C. 274.

*Mr. J. W. Cox,* also for Mrs. Carolina V. Wright and Angeline R. Harrison, appellants, cites: *As to devise to a class:* 44 S. C. 521; 23 S. C. 216; 23 S. C. 225; 21 S. C. 527; 2 Jarm. Wills (1st Am. Ed.) 162, and note. *As to*

*lapsed devise:* A. and E. 748; 17 S. C. 228; 23 S. C. 266; 10 S. C. 429; 23 S. C. 266; 10 Rich. Eq. 538; vol. I, Code, sec. 3559; 19 S. C. 302; 3 DeSaus. 251; 10 A. and E. 725; 93 S. C. 213; 87 S. C. 60.

*Messrs. Hendersons,* for the Moseley Estate, in reply to argument of Mr. Park, for Mrs. Harrison and Mrs. Wright, and of Mr. Thurmond, for Mrs. Mobley, cite: *As to the devise to the Toney children being to a class and not to individuals:* 31 S. C. 412; 30th Encyc. (2d Ed.), p. 718; 4 Strob. Eq. 181; 25 S. C. 362; 19 S. C. 350; 104 S. C. 444, 445, 446; 1 McC. Eq. 61; 40 Cyc., p. 1929; 104 S. C. 98; 96 Mass.; 23 S. C. 224; Jarman on Wills (Edition with American notes), p. 534; 137 Am. St. Rep., p. 110.

March 26, 1918.

The opinion of the Court was delivered by MR. JUSTICE GAGE.

Action to set aside a written agreement between sundry persons upon the ground that it was entered into under a mistaken impression of the law on the part of some of the contractors.   The Circuit Court denied the relief prayed for and dismissed the complaint.   The plaintiffs have appealed from that judgment.

The primary issue in the cause is whether, as matter of fact and law, there was such a mistake as ought to be relieved.   That question decided, other issues in the case arise out of the construction of Mrs. Bacon's will.   Those we denominate secondary issues.

There are exceptions by nearly all the parties; these we shall compass, not by number or in detail, but in substance. The cause is sequel to another cause.   The counsel for plaintiff stated at the bar that this cause is the result of the Court's conclusion in *Boyce v. Moseley,* 102 S. C. 364, 86 S.

E. 771. A history of the transaction out of which the instant cause springs is sufficiently stated in the above cause, and will not be repeated here. It now definitely appears that when Mrs. Bacon devised the lands in issue to Toneys she conveyed to them a title in fee simple. *Boyce v. Moseley, supra.* And had the Toneys before the decision of that cause stood their ground and asserted that title in them from Mrs. Bacon against Boyce and his coplaintiffs and against Moseley, too, they would have won the valuable stake which was at issue—some 500 acres of land worth some $25,000.

Beyond cavil there are cases where parties have been relieved from mistakes, both of fact and of law; but there are not many such in this State. It would be an idle performance to review the cases which have been cited both to sustain and to reverse the decree. We are of the settled opinion, upon consideration of the testimony, that the plaintiffs are not entitled to the relief they ask. The law is always predicated on the facts; we turn, therefore, to the testimony.

Soon after Mrs. Bacon's death on December 6, 1913, Moseley took possession of the land in dispute and claimed it for himself. In the same month, December 30, 1913, the instant agreement was entered into by the Toneys and Moseleys, and pursuant to that agreement the parties in the following month of January, 1914, executed each to the other mutual quitclaim deeds. Thereby Moseley got 490 acres and the Toneys got 69 acres of the home place and some 400 they had aforetime acquired by purchase. Within a few months thereafter the Boyces sued Moseleys and the Toneys to recover the two parcels of land first referred to, and the Toneys and Moseleys made a common cause to defeat the Boyces, and did so.

It was argued in *Boyce v. Moseley* for the Toneys, amongst other and contrary contentions, it is true, and as one of the

defendant's postulates, that Mrs. Bacon was the sole heir at law of Gallman and had the fee; that she conveyed it by will to the Toneys; and that they conveyed it by deed to Moseley. That view was sustained by this Court, and for the reason stated it was not new to the Toneys, and the decision in *Boyce v. Moseley* could not have surprised them. We revert now to the agreement and the circumstances under which it was made, as mainly revealed by the testimony of Governor Sheppard. And in this connection it was altogether proper that the Circuit Court ordered the testimony of this gentleman and of Mr. Henderson to be printed as it was delivered on the stand, for much depends on the testimony. The plaintiff's exceptions thereabouts are overruled.

Governor Sheppard's character as a man and as a lawyer gives to his testimony very high value. Referring to what took place betwixt himself and the Toneys just prior to the making of the agreement, he said:

"My opinion was that the strongest view of that deed from Harmon Gallman was that Mrs. Angeline Bacon, upon the death of her father, became the owner under the statute of distributions of the whole estate, notwithstanding the provisions of the deed; and I believed that that was the strongest view of it. I was not certain about it. I apprehended that I might be mistaken; but it was the dominating view of my judgment. I found out in the investigation that Mr. D. S. Henderson was of a different opinion. And I regarded him as one of the best lawyers in this State, and the knowledge that he differed with me shook to that extent my confidence in my opinion. I ascertained that J. W. Thurmond of this bar, one of the best lawyers that has been at the bar since I have been practicing here, was of the opinion that my view could not be sustained, and he told me so out of his own mouth. I remember the place; he met me in front of the store occupied by Mr. Reeves at that time, and he said: 'Don't be too certain about that merger

decision you are depending upon.' And Mr. Henderson's and Mr. Thurmond's opinion—and Mr. Nicholson I knew to be of the same doubt as to the construction of the deed—and I knew that Tompkins & Wells were then contemplating a suit to the contrary, and that subsequently before this settlement was made Mr. Evans was of the same opinion—and the whole bar was against me and my view of the matter— and, of course, I was in doubt. It would have been a piece of reprehensible presumption for me not to have doubt, in view of the opinion of these other distinguished lawyers, that my opinion was not the proper view of the case.

"I went to Columbia to consult Robert W. Shand, who has been a devoted personal friend of mine since 1879, when I married my wife in the town he lived. And I have time and again in the course of my somewhat important professional experience taken the trouble to go to Columbia and get Mr. Shand's view upon cases in which I had deepest concern. * * * And when that question came up, and these gentlemen all differing with me about my view of that deed, I went to Columbia, and I went with my brief of authorities with me, and Mr. Shand and myself, in his office, read the case of *Rochell v. Tompkins;* and the leading case that distressed me in my consideration of the matter was the case of *McCreary v. Coggeshall,* 74 S. C. 42, 53 S. E. 978, 7 L. R. A. (N. S.) 433, 7 Ann. Cas. 693. When I read that case from start to finish, and reread it time and time again, my apprehension that my first view of this matter began more and more to disappear, to my judgment. And when I appeared before Mr. Spann Toney, Mr. Boatwright, in Mr. Nicholson's office, and Mr. Kirkland and Mr. J. W. Cox were present, representing some of the parties, in my recollection, when we met to consider whether or not we should have a settlement with Mr. Moseley and Mr. Henderson (with Mr. Moseley through Mr. Henderson), as they were claiming the whole of it, as I understood, the second tract upon the principle that there were no words of limitation in

the grant to Mrs. Bacon. And in connection with that view of Mr. Henderson, Mr. Kirkland, who is now in my presence, phoned to me from his home, wherever it was, and asked me if I had read the case of *McMillan v. Hughes,* 88 S. C. 296, 70 S. E. 804. I told him that I had. He says, 'In my judgment under that case we have got no case at all.' I said, 'Mr. Kirkland, don't let that disturb your mind; that case isn't bothering me a bit.' He is present here. The case of *McMillan v. Hughes,* 88 S. C. 296, 70 S. E. 804. I told him he need not be disturbed about that case affecting one tract.

"When we met in Mr. Nicholson's office to consider this matter, I told them that the leaning of my judgment was that we could win the whole business, notwithstanding the opinion of these other lawyers to the contrary—the opinion of these other good lawyers. · I told them that I had gone to Mr. Shand in Columbia and submitted it to him, and that Mr. Shand had told me that he agreed with me, but that he told me he did not know what view the Court would take of the case, and that if my clients could get without litigation one-half of that whole estate, in his judgment, it would be advisable to take it. I stated that that was Mr. Shand's view, and I left it to them to determine whether or not they should fight for the whole of it or get one-half of it for the other in settlement.

"I told them then and there: 'If you gentlemen say so, I will fight for the whole of it, and if I don't win I will have no compensation for my services. I will make the issue for the whole land upon the basis of 10 per cent. of what I win of it.' I told them that, sir, and repeated it. And after the decision of the Supreme Court had been rendered, and after they had decided as they decided, Mr. Kirkland, in Mr. Nicholson's office, in the presence of Spann Toney, Mr. Boatwright, and Mr. Nicholson, stated, 'You can't blame Mr. Sheppard for it, because he told you at the start that in

his opinion he could get the whole business.' That was after the decision was rendered."

Wise men are not dogmatic about the construction of deeds to land. Those who write them oftener than otherwise use words and phrases which they do not understand. Judges professing to understand these words and phrases declare the maker's—we shall call it constructive—intention when there is often grave doubt if such was the maker's real intention.

Governor Sheppard put the Toney parties to elect what they should do: (1) Stand on their right and claim all or lose all, or (2) secure half by a compromise agreement. They decided on the latter course. It is true Spann Toney testifies that he believed that the Courts would award the Toneys both parcels of land, and that he desired that such a fight for it should be made, but that he deferred to Governor Sheppard's opinion, and that gentleman advised a compromise. But this layman could have no opinion about what their legal rights were. He could not judge if the case was doubtful. They had for that issue to rely on the opinion of counsel. It is, therefore, idle for him to declare after the event that he thought the Toneys had a good title.

If he did think so, then he did that which he intended to do; he made no mistake, and can have no relief on that ground. William Toney testified that Governor Sheppard told him after conference with Mr. Shand: "That Mr. Shand said he could not tell what the Supreme Court would hold in regard to this deed, but that if the Toneys could obtain a settlement giving them one-half of the entire lands, both tracts, he would advise them to take it."

That testimony tends to prove that the witness, upon the advice of eminent counsel, balanced the chances and made his choice. For that there can be no relief.

The witness, Kirkland, a member of the bar, testified just the opposite to Spann Toney. He testified: "I did not regard at that time, sir, that my wife owned any interest whatever in that tract of land."

Mr. Kirkland further testified: "I told them we could make the fight for the whole thing, although I did not think we could win it."

In December, 1913, Mr. Kirkland wrote to Spann Toney a letter, and therein declared, touching the tract of 400-odd acres the Toneys got by deed mediately from the Bacons, "As to the tract Mr. Toney bought from Mrs. Bacon *et al.,* there is no law on earth to keep his children from holding." Mr. Kirkland was, therefore, of the opinion that the compromise was a vain thing. He was of the opinion that the Toneys already had a good title to their parcel of land, and that Moseley already had a good title to his parcel of land and there was no need for each side to make quitclaim deeds to the other side.

This gentleman, representing his wife, acted on that opinion of the law which turned out to be partly wrong. For that error of judgment his wife is surely not entitled to relief. The appellants' counsel stated at the bar that be put large reliance upon the case of *Lawrence v. Beaubien,* 2 Bailey, 647, 23 Am. Dec. 155, decided in 1831. It is true that case gives him chief support, and the issue of law it decides is not appreciably different from the appellants' contention here. But the facts in that case are meagerly reported, and a slight modification of the facts often casts a very different horoscope of the law, for the law follows the facts. As late as 1886 this Court declined to apply the doctrine of Beaubien case to facts which might have warranted its application. *Norman v. Norman,* 26 S. C. 47, 11 S. E. 1096. And the Norman case did not follow *Lowndes v. Chisolm,* 2 McCord Eq. 455, 16 Am. Dec. 667, decided in 1827, and which, like Beaubien's case, excused a

mistake of law. We are distinctly satisfied that the plaintiffs in good faith with full knowledge compromised a reasonably doubtful question, and they must abide the consequences. *Keitt v. Andrews,* 4 Rich. Eq. 350.

We now come to the secondary issues. The Moseleys rely, of course, mediately on Mrs. Bacon's title; the Moseleys got title directly from the Toneys; the Toneys got title by Mrs. Bacon's will. The third item of that instrument makes the question now up. It reads:

"I devise my home place on which I live, and on which I have lived for many years, containing five hundred acres, more or less, to William Toney, Mrs. Ione Kirkland, Hattie Toney, H. Spann Toney and M. Dantzler Toney—children of my friends, Mark Toney and Mary H. Toney; the said tract of land to be divided among the said five children share and share alike, and in fee.

"In making this devise I exclude Mark Toney, the youngest child of my friends, Mark and Mary H. Toney, for the reason that he is so generously provided for in the will of his father."

It is the time-old question whether the devise was to individuals or to a class. The relevancy of the inquiry lies in the fact that one of the devisees, Dantzler Toney, died before the will became operative, and the devise to him lapsed or not according to Dantzler's title to it. The question puts in issue some $10,000. The Toneys are not interested in that issue.

The Circuit Court thought the devise was to a class; we conclude it was to the individuals. The only words in the will to suggest the devise to a class are those which after a devise to five named persons follow a dash of the scrivener, thus, "—children of my friends, Mark and Mary H. Toney." The punctuation is significant; the dash is sometimes used in the sense of the parenthesis, and it was manifestly so used

here, "by way of comment inserted in a sentence which would be grammatically complete without it." Webster.

The words were only used as *descriptio personæ,* as the phrase goes. It is significant that the scrivener adopted the same phraseology in the bequest to Mrs. Wright and Mrs. Harrison; these ladies were described as the wives of John Wright and P. B. Harrison. All the balance of the item indicates a plain intention to devise the property to individuals. The circumstance in the will that Mark was excluded points to the inference that the others took individually, and that the testator had the individuals in mind, both those to take and the one not to take. The Court quite unwarrantably, we think, counted that circumstance as one making for a devise to a class.

The Court put stress upon other circumstances, outside the will, to sustain its view. Mrs. Bacon made a codicil to her will after Dantzler died, and in that instrument she made no mention of the fact of Dantzler's death, and she made no direction springing out of that fact. The inference is not reasonably necessary that Mrs. Bacon had thereby concluded that no further direction was necessary because Dantzler's share was swallowed up by the class; she might have concluded that such share went under the rest and residue clause.

The respondent's suggestion is that the law presumes that the testatrix, when she made her will, intended to make a complete disposition of her estate. That is true, and the testatrix did that; the fourth item disposes of any residuum, and that carried any lapsed devise.

Nor is there any force in the respondent's suggestion that before the instant will was made Mrs. Bacon had made another will by which she left the estate to Mark Toney, the father of the plaintiffs. None of these circumstances is sufficient to overcome the plain words of the devise to William, Ione, Hattie, Spann and Dantzler with

the exclusion of Mark, of the said tract of land, share and share alike.

There is no issue betwixt counsel about the rules of construction; counsel only differ about the application of those rules to the instant case. That is generally the sole cause of litigation. The rules of construction in a case like this are well stated in *Jackson v. Roberts,* 14 Gray (Mass.) 546, and there is no need to restate them here.

Another secondary issue arises out of the fourth item of the will of Mrs. Bacon and the codicil which amended that item. In that issue the Toneys are not interested; it concerns only Mrs. Harrison and Mrs. Wright, whom we shall refer to as the devisees, on one side, and Mrs. Mobley and Moseley, whom we shall refer to as the heirs, on the other side, and it is consequent upon the lapse of the devise to Dantzler and the reversion of that devise back to Mrs. Bacon.

The codicil is a modification of item 4 of the will, and the expressed purpose of the modification was to give a legacy of $500 to Charles D. Kenny, a friend of the testatrix. The fourth item of the will reads thus:

"(4) All the rest and residue of my property, of every kind and description whatsoever and wheresoever situated, I give and bequeath unto my two friends, Carolina V. Wright, the wife of John Wright, and Angeline B. Harrison, the wife of P. B. Harrison (the property in this clause mentioned to be divided between the said two ladies, share and share alike)."

The words we have put in parenthesis were the only words of this item omitted from the codicil. The devising part of the codicil reads thus:

"Fourth. All the rest and residue of my property, of every kind and description whatsoever and wheresoever situate, I

give and bequeath unto my friends, Carolina V. Wright, the wife of John Wright, and Angeline B. Harrison, the wife of P. B. Harrison (after the payment of the sum of five hundred dollars to my friend, Charles D. Kenny; my purpose being to give all of my personal property of every kind to these two ladies, except the sum of five hundred dollars to be paid to Charles D. Kenny by my executor as soon after my death as practicable)."

The words we have put in parenthesis constitute the new matter put by the codicil into item 4 of the will. It will be conceded that the lapsed devise descended to the heirs unless it went under the terms of the will to the devisees. And it will be conceded that a general residuary clause will carry both real and personal property of a testator.

The devisees make their claim under the general residuary clause of the fourth item. As that item reads it is plainly a general devise of the residuum. The heirs, however, assert that the codicil so modified that item as to 6-9 convert it into a devise of the residuum of personal property alone, and counsel for the heirs call that a "qualified and restricted residuary clause." And counsel says that such restricted devise of the residuum only carried to the devisees, by the words of the instrument, all the testatrix's "personal property," and the lapsed devise to Dantzler was realty.

We are of opinion that the lapsed devise was realty at Mrs. Bacon's death, and we are further of the opinion that it went under the will to the devisees. The words of the first half of the codicil, which we shall refer to as "old matter," and which create the gift, are as comprehensive as the words of the will; indeed, they are the same words. The words of will and codicil are "all the rest and residue of my property, of every kind and description whatsoever and wheresoever situate, I give," etc. Manifestly, these words in the codicil by themselves are sufficient to carry the lapsed

devise to the devisees, and had the testatrix stopped there the instant question would not have arisen, but the testatrix did not stop.

Looking directly at the codicil, it is made up (1) of a prologue and (2) of a devise. These in an inverse order. Looking directly at the devise, it is made up of two clauses; the first clause expressly gives "all the rest and residue" to the devisees before mentioned; and the second clause purposes to give "all my personal property of every kind," except $500 first to Kenny, to the same devisees.

It is true that, if a later provision in a will is totally inconsistent with a former provision, then the last expression governs. But if both expressions may be harmonized so as to give force to the whole instrument, that ought to be done. *Petters v. Petters,* 4 McCord 151.

We are of the opinion that the two clauses are not irreconcilable, so that one must absolutely yield to the other. The first clause expressly gives "all the residue," which means real and personal and mixed property. The second clause does not refer expressly or by necessary implication to the residuum, but to "my personal property." In the modified first clause the testatrix was providing chiefly for the payment of a legacy to Kenny, and expressly in money; and in that connection the testatrix declares in the second clause that except the $500 to Kenny the lady devisees should have all (the balance) of her personal property.

Reverting now to the prologue, it confirms the view we have expressed. It is true the testatrix intended by the codicil to "modify" the fourth item of the will; the codicil so declares in the two places. But the prologue also declares in what respect the testatrix intended to make the modification; the words to that end are: "I desire to modify the provisions of article 4 * * * so as to provide for my friend, * * * Kenny." The dominating intention of the testatrix

in making the codicil was to provide a pecuniary legacy for Kenny, and she threw in the further declaration that all of personal property should go to the ladies to whom she had aforetime expressly devised her entire residuum, except that which she first gave to Kenny.   Thus all the directions of the will are harmonized and executed.

Our judgment is the decree of the Circuit Court is affirmed and modified in the respects we have indicated, and the cause is remanded to that Court to carry out our views.

MR. CHIEF JUSTICE GARY and MESSRS. JUSTICES WATTS and FRASER concur.

MR. JUSTICE HYDRICK did not sit.